UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


KEVIN R. NUNES,
     Plaintiff,


v.                                        CIVIL ACTION NO. 23-13007-MPK[1]


MARTIN O'MALLEY,[2]
Commissioner of Social Security,
     Defendant.


MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT (#16)[3]
AND DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION (#19)


KELLEY, U.S.M.J.

## I. Introduction.

Plaintiff Kevin R. Nunes seeks reversal of the decision of the Commissioner of the Social Security Administration denying him supplemental security income ("SSI") benefits. (##16, 17, 21.)[4] In turn, defendant submitted a motion to affirm the Commissioner's decision together with

---

[1] With the parties' consent, this case has been reassigned to the undersigned for all purposes, including the entry of judgment. (##13, 14.)

[2] This case was originally filed against Kilolo Kijakazi, then the Acting Commissioner of the Social Security Administration. Martin O'Malley was sworn into office as Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Fed. R. Civ. P. 25(d), Martin O'Malley, in his official capacity, is automatically substituted as the defendant.

[3] The Motion for Summary Judgment (#16) seeks entry of an order for summary judgment in plaintiff's favor or, alternatively, remand.

[4] Plaintiff's Reply Memorandum (#21) simply states that no reply is required and that he relies on the arguments in his original brief.

a memorandum in support. (##19, 20.) With the administrative record having been filed (#12), the cross motions stand ready for decision.

## II. BACKGROUND.

### A. Procedural History.

Nunes filed an application for SSI benefits on April 6, 2020, claiming disability onset on June 27, 2019. (AR at 413-22.)[5] The claim was initially denied on November 30, 2020, and then again on reconsideration. (AR at 251-69; 271-99.) Plaintiff filed a written request for a hearing on May 19, 2022. (AR at 350-52.) Administrative Law Judge ("ALJ") William Ross held a telephonic hearing[6] on October 20, 2022, during which Nunes testified, as did an impartial vocational expert. (AR at 192-232.) At the hearing, plaintiff amended his alleged onset date to August 10, 2020. (AR at 196.)

On December 27, 2022, the ALJ issued an unfavorable decision. (AR at 308-32.) The Appeals Council denied review. (AR at 1-7.) The complaint in the present case was filed on December 7, 2023. (#1.)

### B. Medical Evidence.

The medical treatment records in this case are voluminous. Those records have been thoroughly reviewed but will be recounted here in an abbreviated fashion. Plaintiff's arguments in seeking judgment in his favor or remand are not based on his medical treatment records per se, but rather on the ALJ's treatment of the state agency reviewing psychologists' and consulting physician's opinions, which will be described in more detail.

---

[5] The abbreviation "AR" stands for the Administrative Record.

[6] The hearing was held telephonically due to the Covid pandemic. Nunes, represented by his attorney, agreed to participate via telephone. (AR at 367.)

1. <u>Treatment Records</u>.

On June 17, 2019,[7] Nunes was an unrestrained driver involved in a motor vehicle accident while having a seizure. (AR at 615.)  Prior to the seizure, he had been complaining of a headache as well as several days of abdominal pain and "clamminess." *Id*

At a cardiac follow-up appointment on September 25, 2019, Nunes reported that he had had no problems over the past year, no chest pain or shortness of breath, no palpitation dizziness, orthopnea or edema. (AR at 606.) Plaintiff denied any anxiety, depression, or memory issues. (AR at 610.)

Plaintiff saw Dr. Andrew Blum at The Neurology Foundation, Inc., in mid-January 2020 to assess and treat his seizures. (AR at 669-72.) Nunes reported being seizure free on Tegretol from March 2010 until the car accident in June 2019. (AR at 669.) His neurological examination was normal. (AR at 670.) Dr. Blum's primary assessment was "[l]ocalization-related (focal) (partial) symptomatic epilepsy and epileptic syndromes with complex partial seizures, not intractable, without status epilepticus." *Id.*

A CTA angiogram of the head on February 25, 2020, revealed no intracranial vascular abnormalities. (AR at 677-78.)

During a tele-health visit with Dr. Blum on July 29, 2020, plaintiff stated that he had been feeling a bit tired with sweats over the past year, but he was "doing well, seizure free." (AR at 1055-56.) He was continued on Tegretol and told to follow up again in a year. (AR at 1057.)

Plaintiff was hospitalized from October 5-10, 2020, for spontaneous and severe nosebleed. (AR at 816-45.) The admission record reflects that Nunes was taking Coumadin, a blood thinner,

---

[7] This is before his alleged amended onset date of August 10, 2020.

and that he had a history of seizure, asthma, Crohn's colitis, and "multiple other comorbidities." (AR at 824.)  On October 15, 2020, plaintiff saw his physician for a follow-up visit after his hospitalization for extensive epistaxis and he complained of nasal congestion, fatigue, diarrhea, and chest pain. (AR at 1026-33.) Nunes had a cardiology follow-up appointment on October 20, 2020, during which he complained of weight loss and general fatigue but, apart from his very high cholesterol numbers, his physical examination was normal. (AR at 713-17.)

On October 29, 2020, Nunes again went to the Emergency Room for a nosebleed. (AR at 809-15.) The doctors were able to get the bleeding under control and plaintiff was discharged. *Id*. Plaintiff had a visit with his doctor on November 4, 2020, who noted that following the nosebleed treatment, Nunes had three seizures. (AR at 1016-25.)

Nunes arrived in the Emergency Department of Charlton Memorial Hospital on January 10, 2021, after suffering a seizure. (AR at 776.) His last reported seizure was a couple of months earlier. *Id*. A CT head scan revealed "[l]eft frontal lobe hypodensity new since February 2020 and likely the sequela of a chronic infarct." (AR at 792.)

At a doctor's office visit on February 9, 2021, Nunes complained of chest discomfort, postnasal drip, and night sweats after having a Covid infection in January. (AR at 1042.) Upon examination, plaintiff had wheezing and crackles in the right lung. (AR at 1044.) The doctor diagnosed an asthma exacerbation. (AR at 1049.)

A chest CT on August 9, 2021, showed coronary artery calcifications and severe diffuse hepatic steatosis. (AR at 926.)

On March 8, 2022, plaintiff had an appointment with Dr. Blum. (AR at 1051.) He reported having Covid in January 2021 and thereafter having persistent daily headaches and worsening

short term memory issues. (AR at 1052.) He was seizure free since January 2021. *Id*. Dr. Blum ordered a brain MRI and continued Tegretol. (AR at 1053.)

On May 2, 2022, Nunes underwent an MRI of the brain and an MRV of the head which showed "[s]table multifocal encephalomalacia and gliosis in the cerebral hemispheres bilaterally and right cerebellar hemisphere consistent with sequelae of chronic infarct." (AR at 912, 920, 1104-05.)

Plaintiff presented in the Emergency Department on August 20, 2022, with abdominal pain and vomiting over a period of days. (AR at 875.) Upon examination, he was noted to have abdominal tenderness, and a CT scan showed duodenitis. (AR at 879, 881.) Morphine was administered for breakthrough pain and a GI appointment was scheduled. (AR at 881.) At the GI appointment on August 22, 2022, the doctor reported that Nunes had a long history of chronic diarrhea without an obvious cause and that the recent CT scan demonstrated "some mild duodenitis with in (sic) thickening and inflammation around the duodenum." (AR at 942.) An upper GI endoscopy was scheduled, the results of which showed a normal duodenum. (AR at 943, 950.)

During a neurological follow-up visit on September 14, 2022, Nunes reported that he had had no seizures between March 2022 and September 2022. (AR at 1003.) Dr. Blum noted that the MRI/MRV testing had been negative, and that plaintiff's headaches related to his Tegretol dosage being too high. *Id.* The doctor's assessment was that plaintiff was "doing generally very well, without seizures and doing better with his Teg level closer to 9-11." (AR at 1004.)

2. <u>State Agency Examinations/Assessments</u>.

On July 14, 2020, state agency consultant Dr. Wayne Draper conducted a physical residual functional capacity assessment of Nunes. (AR at 259-63.) Dr. Draper determined that plaintiff

could perform light, unskilled work with certain postural and environmental limitations, and that he was not disabled. (AR at 267-69.)

On November 12, 2020, Dr. Mark Sokol conducted a psychodiagnostic interview with Nunes, and then filed a consultative examination report with the Massachusetts Rehabilitation Commission Disability Determination Services on November 21, 2020. (AR at 723-28.) With respect to his mental status, Dr. Sokol noted that plaintiff was cooperative, casually dressed but poorly groomed. (AR at 726.) His affect was both anxious and depressed, he was tearful at times, and he had some psychomotor slowing. *Id.* His ability to recall immediate and past events was grossly intact. *Id.* Dr. Sokol diagnosed Nunes with generalized anxiety disorder and major depressive disorder without psychotic symptoms, moderate to severe, currently moderate. (AR at 728.) Dr. Sokol opined that plaintiff's "medical issues predominate" and he would "defer to medical on the questions of his residual functional capacities." (AR at 726.) Dr. Sokol further opined that Nunes had "significant depression and anxiety" that would "adversely impact his ability to relate adequately with co-workers, supervisors, and the general public," and he had "some psychomotor slowing, which would adversely impact his pace." (AR at 726-28.)

On November 28, 2020, state agency reviewing psychologist Dr. Chivi Kapungu performed a mental residual functional capacity assessment. (AR at 263-67.) Dr. Kapungu found as follows: Nunes had no understanding and memory limitations. (AR at 263.) With respect to plaintiff's sustained concentration and persistence levels: he was not significantly limited in his ability to carry out very short and simple instructions, carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions.

(AR at 264.) Nunes was moderately limited in his ability to maintain attention and concentration for extended periods of time as well as his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Kapungu opined that plaintiff could perform simple routine tasks for two-hour periods during a forty-hour workweek. (AR at 265.)

With respect to Nunes' social interaction limitations, Dr. Kapungu determined that he was not significantly limited in his ability to interact appropriately with the general public, to ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (AR at 265.) He was found to be moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. *Id*. Dr. Kapungu opined that plaintiff could maintain superficial work relations. (AR at 266.)

Regarding plaintiff's adaptation limitations, Dr. Kapungu concluded that he was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions or in his ability to travel to unfamiliar places or use public transportation, but that he was moderately limited in his ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (AR at 266.) Dr. Kapungu opined that Nunes could tolerate minor work stress. *Id.*[8]

---

[8] Dr. Kapungu indicated that Dr. Sokol's November 2020 evaluation had been considered. (AR at 266.)

On April 5, 2021, Dr. K. Malin Weeratne completed a physical residual functional capacity assessment of Nunes, opining that the previous assessment by Dr. Draper, i.e., that he could perform light work with postural and environmental limitations, was affirmed. (AR at 281-85.)

Dr. Sokol filed a second consultative examination report on November 6, 2021. (AR at 853-58.) Regarding plaintiff's mental health status, he was cooperative, responsive, casually dressed, and adequately groomed. (AR at 856.) His thought processes were coherent and goal directed, while his affect was depressed, irritable and not flexible. *Id.* Plaintiff was unable to perform serial sevens, was slow in object naming and was unable correctly to repeat the phrase "no ifs, ands, or buts." *Id.*[9]   Nunes' intellectual functioning appeared to be within the average range, his insights into his own dynamics were poor and his judgment was fair. *Id.* His ability to recall recent and immediate events appeared mildly impaired, while his ability to recall past events seemed grossly intact. *Id.* To Dr. Sokol, plaintiff appeared to have some problems with short term memory and concentration. *Id.*

Dr. Sokol opined that Nunes would have difficulty relating adequately with coworkers, supervisors, or the general public; he would have difficulties learning with ordinary training; and he would have difficulties with attention, concentration, and memory. (AR at 858.) Plaintiff was diagnosed with depressive disorder NOS, rule out neurocognitive disorder with amnestic features. *Id.*

On November 16, 2021, state agency reviewing psychologist Dr. Kate Collins-Wooley opined that Nunes had no mental limitation in his ability to understand, remember, or apply information, but that he was moderately limited in his ability to interact with others, concentrate,

---

[9] Dr. Sokol noted that Nunes was coughing and congested and sat at the far end of the room during the evaluation. (AR at 856.)

persist, or maintain pace, and adapt or manage himself. (AR at 293-94.) Further, plaintiff was found to have no memory limitations; he remained "able to focus sufficiently for simple tasks at a reasonable pace"; he remained "appropriate for simple social demands"; and he was "able to respond to simple adaptation demands." (AR at 297.)[10]

On February 11, 2022, Dr. Yacov Kogan submitted a consulting report to the Massachusetts Rehabilitation Commission Disability Determination Services after an examination of Nunes. (AR at 861-66.)  Dr. Kogan reviewed plaintiff's medical records and plaintiff's self-reports regarding his medical history. (AR at 861-62.) In his medical source statement, Dr. Kogan opined that Nunes had "no range of motion deficits and no neurological deficits that limit sitting, standing, walking, bending, lifting, carrying, reaching or finger manipulations," although those "activities [were] mildly limited due to symptoms of generalized musculoskeletal pain." (AR at 865.) Further, plaintiff's "[w]ork related activities involving exertion [were] mildly limited due to asthma." (AR at 865-66.) Nunes' cardiac exam was normal, "including normal heart rate and rhythm, no murmurs, no stigmata of congestive heart failure, and normal blood pressure." (AR at 866.) His abdomen was benign on examination, and there were no signs of liver disease. *Id.*

On March 31, 2022, state agency medical consultant Dr. Ilia Coka opined that Nunes could occasionally lift 20 pounds and frequently lift 10 pounds; he could stand and/or walk for 6 hours and sit for 6 hours; he was unlimited to push and/or pull with all four of his extremities; he should never climb ladders, ropes and/or scaffolds; and he should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dust, gases, poor ventilation, unprotected heights, and/or operating heavy machinery. (AR at 296.)

---

[10] Like Dr. Kapunga, Dr. Collins-Wooley considered Dr. Sokol's assessments. (AR at 298.)

C. <u>Plaintiff's Hearing Testimony.</u>

Nunes testified that he lived alone in a house in Swansea, Massachusetts. (AR at 199.) He has a driver's license, but after a car crash in which he was involved when he suffered a seizure, he limited his driving to his local area. (AR at 199-200.) Nunes is medically prohibited from driving for six months following a seizure. (AR at 200.)

He graduated from high school, can read and write English, and perform simple mathematics. (AR at 200-01.) He was self-employed in the past; he owned a carwash and worked as an auto detailer. (AR at 201.) In that business, Nunes worked sixty hours a week, was always on his feet, and lifted up to sixty pounds. (AR at 201-02.) In addition, he worked for the Town of Swansea fire department as a volunteer firefighter, and he did snow plowing for the Town. (AR at 202.)

When asked why he could no longer work, Nunes responded that he cannot lift because he had no strength in his hands or lower back related to his seizures and ministrokes in his sleep. (AR at 202-03.) Plaintiff described having a hard time walking since he had blood clots in both legs. (AR at 204.) Nunes noted hip, leg and lower back problems. *Id.*[11]

Plaintiff testified that his last seizure had occurred in January of 2021. (AR at 206.) When having a grand mal seizure, Nunes experienced weakness in his legs, hands, and lower back. (AR at 207.) He has difficulty walking and his memory was poor. *Id*. He also stated that he had been

---

[11] When the ALJ observed that there were few examinations and little treatment noted in the record regarding the litany of physical complaints, plaintiff's attorney stated "that the focus of Nunes' treatment really has been on his seizures." (AR at 204.) It was noted that plaintiff primarily treated at Prima CARE but also The Neurology Foundation, Inc. (AR at 204-05.) The Neurology Foundation office records were entered into evidence, but no opinion evidence was submitted. (AR at 205.)

suffering from migraine headaches daily for four or five years. *Id*. He is not on medication for the migraines because he did not want to take the chance of it interacting with his seizure medication. *Id*. Plaintiff described having tremors in his hands and arms every day. (AR at 208.) He also had gastrointestinal issues, including duodenitis, that cause diarrhea six to ten times daily. (AR at 208-09.) Nunes does not sleep well at night and so takes naps during the day. (AR at 210.)

The medications plaintiff takes have side effects. *Id*. Tegretol, which is taken for seizures, makes him tired. *Id*. Warfarin, a blood thinner, caused bruising and bleeding. *Id*. He does not use any special equipment such as braces or a cane. (AR at 211.)

Nunes described being constantly depressed and having anxiety which sometimes caused panic attacks during which he got jittery and would break out in a sweat. *Id*. The panic attacks last for twenty to thirty minutes, and he gets them about twice a week. (AR at 211-12.) Nunes stated that he was depressed every day. (AR at 212.) Plaintiff has never received treatment for mental health issues, has not taken any drugs for mental health conditions, does not go to counseling or therapy, and has not been hospitalized. *Id*.

Plaintiff testified that both his long and short-term memory were poor, as was his ability to concentrate, but that he has not received any treatment for these problems. (AR at 212-13.) Nunes stated that he had difficulty understanding instructions or directions and making decisions. (AR at 213.)  He testified that he got along well with people and had regular contact with his mother and stepfather. (AR at 214.) He drank four to six beers a couple of nights a week. *Id*.

Nunes testified that he could walk and stand for about two minutes before his back and legs would start to cramp. *Id*. He could sit for five or ten minutes before he had to get up and move. (AR at 214-15.) He spent most of the day lying down. (AR at 215.) If plaintiff was having tremors, he had difficulty lifting a gallon of milk or buttoning a shirt. *Id*. He has problems reaching above

his head, climbing stairs, bending over from the waist, kneeling and balancing. (AR at 215-16.) Heat and humidity bother him. (AR at 216.) Nunes has no problem dressing, showering or washing his hair. *Id*.

Plaintiff does not do meal preparation, cleaning, laundry, grocery shopping or gardening. (AR at 217.) His mother lives next door and helps him. *Id*. He does not use a computer or smartphone or any social media. (AR at 218.)

Nunes has had Covid three times and testified that he goes bi-weekly to Charlton Memorial Hospital where they infuse him with Xolair to rehabilitate his lungs. *Id*. He has also been on prednisone due to shortness of breath, difficulty breathing and wheezing. (AR at 219.) Due to his gastrointestinal problems, plaintiff estimated that, if working, he would have to take about six bathroom breaks a day. (AR at 220.)

D. Vocational Expert's Hearing Testimony.

John Bopp was called as the vocational expert at the administrative hearing without objection. (AR at 222.) Following a clarification of the actual tasks Nunes performed in his past work as owner of a car wash and auto detailer, Bopp described the composite job as SVP[12] of 6 for the work as performed. (AR at 225.)

The ALJ posed the following hypothetical:

---

[12]The Social Security Program Operations Manual System (POMS) defines SVP as follows:
**Specific vocational preparation (SVP)**
The amount of time required for a typical claimant to:
Learn the techniques,
Acquire the information, and
Develop the facility needed for average performance in a job.
*POMS* § DI 25001.001 Medical and Vocational Quick Reference Guide.

> [A]ssume an individual of the Claimant's age, education, and work background, is able to lift and carry 20 pounds occasionally, 10 pounds frequently, as well as sit for six hours and stand or walk for six hours in an eight-hour day. He could never climb ladders, ropes, or scaffolding. He can occasionally kneel, stoop, crouch, crawl, and climb stairs and ramps. He can occasionally balance on narrow, unsteady, or erratic surfaces. He must avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, and fumes, odors, dust, gases, and poor ventilation. He must avoid all exposure to unprotected heights and dangerous machinery. He can perform simple, routine, and repetitive tasks over an eight-hour workday, within a normal break schedule. He can make simple work-related decisions. He can occasionally interact with supervisors and coworkers. He can interact with the public on an occasional basis provided interaction requires no more than exchange of non-personal, work-related information or hand off of products or materials. He can tolerate simple, routine changes in a work setting. Could this individual perform the Claimant's past relevant work?

AR at 225-26.

The vocational expert responded that the past relevant work could not be performed, but that there were jobs in the economy that person could perform, i.e., a housekeeping cleaner, a power screwdriver operator, and a price marker. (AR at 226-27.) If the hypothetical was amended to reduce the standing and walking to four hours and include frequent handling and fingering bilaterally, the person could perform work as a sub-assembler and an inspector and hand packager. (AR at 227.)

The vocational expert opined that an acceptable off-task amount of time would be 10% in addition to normal breaks. (AR at 228.) Any more off-task time would preclude work. *Id.* An acceptable number of absences from work would generally be one per month with a maximum of eight per year. (AR at 228-29.)

## III. DISABILITY STANDARD AND THE ALJ'S FINDINGS.

A. Disability Standard.

Eligible claimants for SSI benefits must demonstrate that they are, among other things, aged, blind, or "disabled" within the meaning of the Social Security Act. 42 U.S.C. §§ 1382(a)(1), 1382c(a)(1)(A) ("For purposes of [SSI eligibility], the term 'aged, blind, or disabled individual'

means an individual who is 65 years of age or older, is blind . . . , or is disabled (as determined under [§ 1382c(a)(3)]). . . .");  *see Allison M. v. Kijakazi*, No. 22-cv-10033-FDS, 2023 WL 5650100, at *5 (D. Mass. Aug. 31, 2023). "'Disability' is defined, in relevant part, as the inability 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Allison M.*, 2023 WL 5650100, at *5 (quoting 42 U.S.C. § 1382c(a)(3)(A)). The impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 1382c(a)(3)(B). Relevant to the issues presented in this case, "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

ALJs use a familiar five-step test to determine if an individual is "disabled" according to the above definition. 20 C.F.R. § 416.920 (test); *Purdy v. Berryhill*, 887 F.3d 7, 10 (1st Cir. 2018); *Phillips v. Kijakazi*, No. 4:22-cv-10319-IT, 2023 WL 5807344, at *3 (D. Mass. Sept. 7, 2023).

> The test asks questions that are sequential and iterative, such that the answer at each step determines whether progression to the next is warranted: (Step 1) whether the claimant is currently engaging in substantial gainful activity; if not, (Step 2) whether the claimant has a severe impairment; if so, (Step 3) whether the impairment meets or medically equals an entry in the Listing of Impairments; if not, (Step 4) whether the claimant's [RFC] is sufficient to allow [him] to perform any of [his] past relevant work; and if not, (Step 5) whether, in light of the claimant's RFC, age, education, and work experience, [he] can make an adjustment to other work available in the national economy.

*Sacilowski v. Saul*, 959 F.3d 431, 433-34 (1st Cir. 2020) (citing 20 C.F.R. §§ 404-1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v) (2012)); *see also Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920 (2001)). The SSI applicant bears the burden of proof on steps 1 through 4; at

14

step 5, the burden shifts to the Commissioner to come forward "'with evidence of specific jobs in the national economy that the applicant can still perform,' or else a finding of disability is required." *Purdy*, 887 F.3d at 9-10 (quoting *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001)); *see also Sacilowski*, 959 F.3d at 434; *Seavey*, 276 F.3d at 5. "At that juncture, the ALJ assesses the claimant's [RFC] in combination with the vocational factors of the claimant's age, education, and work experience, to determine whether . . . [he] can engage in any kind of substantial gainful work which exists in the national economy." *Allison M.*, 2023 WL 5650100, at \*5 (citing 20 C.F.R. §§ 416.920(g), 416.960(c)).

B. The ALJ's Findings.

The ALJ concluded that plaintiff had not engaged in substantial gainful activity since August 10, 2020, the amended onset date. (AR at 314.)  Nunes was found to have the following severe impairments: duodenitis; epilepsy/cerebral infarct; asthma; migraines; irritable bowel disease (IBD); depressive disorder; and generalized anxiety disorder. *Id.* The ALJ determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 316.)

After a thorough review of the record, the ALJ found that Nunes had the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b), including the ability to lift and carry 20 pounds occasionally and 10 pounds frequently, as well as sit for 6 hours in an 8-hour workday. (AR at 318.) Plaintiff could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolding. *Id.* He could occasionally kneel, stoop, crouch, and crawl, and occasionally balance on narrow, unsteady, or erratic surfaces. *Id.* Nunes would have to avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, and pulmonary irritants,

such as fumes, odors, dusts, gases, and poor ventilation. *Id.* He would also have to avoid all exposure to unprotected heights and dangerous machinery. *Id*. Plaintiff could perform simple, routine, and repetitive tasks over an 8-hour workday within a normal break schedule. He could make simple work-related decisions. *Id*. He could occasionally interact with supervisors and co-workers as well as with the public provided the interaction required no more than exchange of non-personal work-related information or handoff of products or materials. *Id*. Nunes could tolerate simple routine changes in a work setting. *Id*.

Plaintiff was unable to perform any past relevant work. (AR at 325.) He fell within the definition of an individual closely approaching advanced age under the regulations at the time he filed his application for benefits. (AR at 326.) Nunes has a high school diploma. *Id*. Transferability of jobs skills was immaterial because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled" whether he had transferable job skills or not. *Id.* The ALJ determined that considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform. *Id*. The ALJ concluded that Nunes had not been under a disability, as defined in the Social Security Act, since August 10, 2020, the amended onset date. (AR at 327.)

V. Standard of Review.

Title 42 U.S.C. § 405(g) provides, in relevant part:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the

16

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L. Ed. 2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) ("And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high . . . . [i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal citation and quotation marks omitted)); *Libby v. Astrue*, 473 Fed. Appx. 8, 8 (1st Cir. 2012).

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Biestek*, 587 U.S. at 103; *Purdy*, 887 F.3d at 13. As the First Circuit explained:

> In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Sec'y of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)); *Purdy*, 887 F.3d at 13; *Carrara v. Kijakazi*, No. 21-CV-10239-DJC, 2022 WL 4111799, at *2 (D. Mass. Sept. 8, 2022), *aff'd*, No. 22-1861, 2023 WL 7474407 (1st Cir. June 26, 2023).

In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *See Ward v. Comm'r of Soc. Sec. Admin.*, 211 F.3d 652, 655 (1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); *Burton v. Kijakazi*, No. 21-CV-11916-ADB, 2023 WL 2354901, at *6 (D. Mass. Mar. 3, 2023). Finally, "[e]ven in the presence of substantial evidence . . . the Court may review conclusions of law and invalidate findings of fact that are derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Sacilowski*, 959 F.3d at 437 (quoting *Nguyen*, 172 F.3d at 35); *see Purdy*, 887 F.3d at 13 ("Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or the courts." (internal quotation marks and citations omitted)).

## V. Discussion.

Plaintiff raises two issues in his motion. He first argues the ALJ's RFC is not supported by substantial evidence because he failed to incorporate various limitations from the state agency reviewing psychologists' opinions that he found to be persuasive, and he rejected both consulting opinions from Dr. Sokol without properly considering the regulatory factors.

The ALJ found the assessments of Dr. Kapunga and Dr. Collins-Wooley to be "partially persuasive," with Dr. Collins-Wooley's findings being "more persuasive." (AR at 323.) The ALJ concluded that

> The overall identified residual limitations by both experts, generally limiting the claimant to unskilled work for only 2 hour periods with only superficial interpersonal interactions and only minor changes in work routine are consistent with the record as a whole and are supported by the claimant's medical records, his mental status examinations by all his providers, and his consultative examinations.

(AR at 323.) Plaintiff complains that, despite these findings, the ALJ offered no explanation as to why he failed to incorporate many of the numerous moderate limitations found by the doctors.

The Social Security Program Operations Manual System (POMS) addresses the issue raised by Nunes.  POMS provides as follows:

DI 24510.060 Mental Residual Functional Capacity Assessment

A. Operating Policy
   **1. Special Form**
   Because of the complexity of mental disorder evaluation, a **special Form SSA-4734-F4-SUP** is to be used to document the mental residual functional capacity (RFC) decision, i.e., what an individual can do despite his /her impairment.

                              *****
B. Description of Form SSA-4734-F4-SUP
   Form SSA-4734-F4-SUP is divided into four sections:
   **
   Heading,
   **
   Section I, Summary Conclusions,
   **
   Section II, Remarks,
   **
   Section III, Functional Capacity Assessment and MC/PC signature.

   **1. Heading**
   The **Heading** provides space to record claimant and claim identification data.

   **2. Section I**
   **Section I—Summary Conclusions** is designed to record the MC/PC's analysis of the evidence and his/her conclusions about:
   **
   the presence and degree of specific functional limitations, and
   **
   the adequacy of documentation.
       1. a.
           **Section I is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment.**
       2. b.
           **Twenty mental function items** are grouped under **four main categories:**
           **

19

       Understanding and Memory,
       **
       Sustained Concentration and Persistence,
       **
       Social Interaction, and
       **
       Adaptation

3. c.

       **To the right of each of the items** is a series of **decision checkblocks** under the headings:
       **
       Not Significantly Limited
       **
       Moderately Limited
       **
       Markedly Limited
       **
       No Evidence of Limitation in This Category, and
       **
       Not Ratable on Available Evidence
       *****

**4. Section III**

1. a.

       **Section III—Functional Capacity Assessment,** is for recording the mental RFC determination. It is in this section that the **actual mental RFC assessment is recorded,** explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings. Disability Case Processing System (DCPS) users may document this information in the "MRFC Additional Explanation Textbox" that is noted to be optional.

2. b.

       The **discussion** of all mental capacities and limitations in this section **must be in narrative format.**
       The MC/PC must also include any other information that he/she believes is necessary to present a complete picture of mental RFC.
       *****

*POMS* § DI 24510.060(B)(2).

The numerous moderate limitations that the ALJ did not incorporate in his decision are the mental function items on the checklist completed by the state agency medical reviewers. POMS unequivocally states that the checklist items do not constitute the RFC assessment. Rather, the

mental RFC is found in the narrative portion of medical examiners' reports, which explain how the mental functional items on the checklist impact the plaintiff's functioning. It was those narrative parts of the state agencies medical reviewers' reports upon which the ALJ relied in making his decision.  There is no error.[13] *See, e.g., Dorman v. Soc. Sec. Admin.*, No. 4:12-CV-40023, 2013 WL 4238315, at *14 (D. Mass. May 21, 2013).

The ALJ found that Dr. Sokol's opinion in his two assessments was "not persuasive." (AR at 324.) Specifically, Dr. Sokol was found to have used "vague descriptions of limitations, which are not the basis for discrete residual functional capacity limitations." *Id.* The ALJ further

---

[13]Plaintiff contends that it was particularly egregious that the ALJ did not include any off-task limitation at all. How, defendant correctly points out that:

> A limitation to maintaining concentration for two-hour periods in the course of an eight-hour workday 'is simply a term of art, or shorthand reference, to a basic presupposition inherent in the concentration, persistence, and pace analysis.' *Baker v. Social Sec. Admin. Comm'r*, No. 10-cv-167-JAW, 2011 WL 1298694, at *4 (D. Me. Mar. 31, 2011). The SSA's Program Operations Manual System ("POMS") instructs administrative adjudicators to '[c]onsider an 8-hour workday and a 5-day work week (with normal breaks, e.g., lunch, morning and afternoon breaks) in evaluating the ability to sustain work-related functions.' POMS DI 24510.005(C)(2)(b). As such, state agency doctors generally 'express their RFC opinions about a claimant's ability to sustain concentration and persistence in terms of being able to do so in "two-hour blocks."' *Baker*, 2011 WL 1298694, at *4. Accordingly, [the two non-treating medical reviewers'] opinions can be most reasonably interpreted to mean not that [plaintiff] could only work for two hours in a single day, but rather, that she could concentrate for two-hour segments within a typical day. This is reinforced by the fact that [the two non-treating medical reviewers] both found [plaintiff] to not be disabled.

*Degraffenreid v. Colvin*, No. 15-CV-10185-ADB, 2016 WL 5109509, at *7 (D. Mass. Sept. 20, 2016).

And so it is here. At the initial level, Dr. Kapunga opined that plaintiff could perform simple routine tasks for two-hour periods during a forty-hour work week. (AR at 267.) Dr. Collins-Wooley, on reconsideration, stated that her assessment was "consistent with the initial psych assessment." (AR at 294.) Both doctors concluded that plaintiff was not disabled.

concluded that Dr. Sokol's "overall mental status examinations (sic) findings suggest no more than moderate limitations that result from the claimant's mental impairments," and that those moderate limitations were incorporated in the RFC. *Id*. These two conclusions are not contradictory and do not establish that the ALJ erred. Notwithstanding plaintiff's argument to the contrary, the ALJ could reasonably find both that Dr. Sokol's opinions that Nunes would be "adversely impacted[ed]" by certain impairments, or that those impairments would cause "difficulties" were too vague upon which to base a mental RFC assessment, but simultaneously conclude that Dr. Sokol's mental status "findings suggest no more than moderate limitations" which were included in the RFC.

The ALJ specifically declined to rely on Dr. Sokol's assessments, finding them to be "vague." This fact distinguishes the instant case from *Watkins v. Berryhill*, No. 3:16-CV-30117-KAR, 2017 WL 4365158 (D. Mass. Sept. 29, 2017) cited by plaintiff. In *Watkins*, relying on medical opinions, the ALJ determined at step two of the evaluation process that plaintiff "had moderate difficulties maintaining concentration, persistence, or pace", but then omitted any such limitation in his RFC without explanation. *Id.* at *10. The court held "[t]he ALJ may have had reasons for accepting certain limitations while rejecting others. However, he was required to explain why he rejected some limitations contained in a[n] RFC assessment from a medical source while appearing to adopt other limitations contained in the assessment." *Id*. at *11 (internal citation and quotation marks omitted). The ALJ here did not cherry pick Dr. Sokol's assessments, he rejected them in toto, finding them to be "not persuasive."

Plaintiff's contention that "Dr. Sokol's opinions were longitudinally consistent with each other" is factually inaccurate. (# at 12.) The ALJ properly stated in his decision that initially "Dr. Sokol assessed the claimant with generalized anxiety disorder and major depressive disorder

without psychotic symptoms, moderate to severe, currently moderate." (AR at 320.) After his second consultative examination of Nunes, Dr. Sokol "assessed different diagnoses from his initial evaluation, now diagnosing the claimant with depressive disorder, NOS, and rule out neurocognitive disorder with amnestic features." (AR at 321.) Similarly, the ALJ related that following his first examination, Dr. Sokol reported that, after testing, plaintiff showed no indication of cognitive impairment. (AR at 320.) In his second assessment, Dr. Sokol reported that Nunes was unable to complete the testing and made numerous errors, i.e., he did not know the date, he was unable to perform serial 7s, he was unable to correctly repeated a phrase. (AR at 321.) There is substantial evidence to support a finding that Dr. Sokol's two reports were not longitudinally consistent with each other.

The second issue raised in plaintiff's motion is that the ALJ's physical RFC is unsupported because the ALJ made reversible errors in evaluating Dr. Kogan's consulting opinion. The ALJ made the following evaluation with respect to Dr. Kogan's opinion:

> In his assessment, Dr. Kogan found that the claimant would (sic) mild limitations in sitting, standing, walking, bending, lifting, carrying, reaching, and finger manipulations to be unpersuasive. Further, work related activities involved exertional (sic) would be mildly limited due to asthma. The term 'mild' that has been used to define the extent of the limitations by Dr. Kogan is vague and the overall limitations are not in vocationally relevant terms, in which to base a residual functional capacity on (sic). However, the examination findings by Dr, Kogan and the overall non-disabling nature of the resulting limitations he identified are consistent with the overall medical evidence and are useful in formulating a residual functional capacity.

(AR at 324.)

The ALJ did not err in concluding Dr. Kogan's opinion that plaintiff was mildly limited is unhelpful in formulating an RFC, where the doctor did not proffer an opinion on any specific functional abilities and limitations. "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-

function basis." *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P, 1996 WL 374184, *1 (S.S.A. July 2, 1996). Does "mildly limited" mean plaintiff can sit for two hours? Four hours? Six hours? Dr. Kogan did not translate his vague terms into vocationally relevant terms. The ALJ's finding that the doctor's opinion was "less persuasive" is supported by substantial evidence.

Further, even if the ALJ credited Dr. Kogan's opinions and incorporated the "mild" restrictions into his RFC, plaintiff has not explained how that would affect the RFC in a way that would be favorable to him. As defendant notes, plaintiff's attorney (or others in his law firm) have advanced a similar argument in other cases, and it has been rejected. *See Sheila W. v. Comm'r of Soc. Sec.*, No. 1:20-CV-01636 CJS, 2022 WL 4493926, at *8 (W.D.N.Y. Sept. 28, 2022) ("Insofar as the ALJ found [the doctor's] report unpersuasive, it was because he did not express his opinion in 'vocationally relevant terms,' meaning that [the doctor] used terms like 'mild to moderate limitation' and 'mild limitation,' rather than indicating that Plaintiff could perform work at a particular exertional level. However, the ALJ did not question the accuracy of [doctor's] findings, which, as the ALJ noted, were benign and largely consistent with the rest of the evidence. The ALJ was entitled to rely on those findings."); *Dino A. v. Saul*, No. 20-cv-438L, 2021 WL 2457680, at *2 (W.D.N.Y. June 16, 2021) ("It is well settled that mild exertional limitations are not inconsistent with the ability to perform light work.") (collecting cases); *Jermaine R. v. Comm'r of Soc. Sec.*, No. 1:19-CV-0855(WBC), 2020 WL 7352548, at *4 (W.D.N.Y. Dec. 15, 2020) ("The ALJ's RFC determination clearly incorporated the mild limitations opined by [the doctor even though] the doctor did not define the term mild nor provided limitations in 'vocationally relevant' terms") (collecting cases). Like the ALJ in the *Sheila W*. case, the ALJ here determined that Dr. Kogan's

medical findings were consistent with other medical evidence in the record. That conclusion is not erroneous or inconsistent.

## IV. Conclusion.

For the reasons stated, plaintiff's Motion for Summary Judgment (#16) is DENIED and Defendant's Motion to Affirm the Commissioner's Decision (#19) is GRANTED.

February 24, 2025                                    /s/ M. Page Kelley
                                                    M. Page Kelley
                                                    United States Magistrate Judge